No. 23,034.

THE SALINE VALLEY BANK, *Appellant*, v. C. H. PECKHAM, *Appellee*, et al.

SYLLABUS BY THE COURT.

1. PROMISSORY NOTE—*Procured by Fraud—Holder With Notice of Fraud —Note Not Controlled by Law of Commercial Paper.* Where a promissory note is procured by the fraud of the payee, but such note never passed into the hands of an innocent holder in due course, the law of commercial paper does not control the obligation of the maker of such note.

2. SAME—*Procured by Fraud—Subsequent Contract to Return Note to Maker—Note and Contract Construed Together.* Where the payee of a note has bound himself to the maker, in writing, that he would surrender the note to the maker at or before its maturity, the note and the contract in writing are to be read and construed together in an action by a plaintiff who acquired it with full notice of its infirmities and who knew and had custody of the written contract.

3. SAME—*Rights of Purchaser With Notice of Its Infirmities.* One who purchases a note before maturity with full notice of the defenses thereto stands in the same position towards its possible enforcement as the payee himself.

4. SAME—*Note Procured by Fraud—Subsequent Contract—No Waiver of Fraud—Purchaser with Notice of Fraud and Contract Cannot Recover on Note.* Where a promissory note has been procured from the maker by the fraud of the payee, and after the discovery of the fraud the maker and the payee make an agreement in writing that the maker will permit the note to run to maturity and permit the payee to discount it, upon condition that the payee will take it up and deliver it to the maker without payment and without cost to him, and the payee gives the maker a sum of money to cover any expense he might be put to in procuring the return of the note, and where pursuant thereto the payee discounts the note to a bank which had notice of the fraud and knew the contents of the agreement in writing and was the custodian of that agreement, and the payee fails to redeem and surrender the note to the maker, and the bank brings action against the maker thereon, it is *held* (1) that the contract to redeem and surrender the note did not waive the fraud since the contract was not complied with; and (2) the note and the agreement together constituted one entire contract between the parties; and (3) that the bank stood in no better position than the payee and could not recover thereon.

5. SAME—*Procured by Fraud—When Controlled by Law of Contracts.* Under the state of facts above set forth the law controlling the case is the law of contracts, and not the law of commercial paper.

Appeal from Lincoln district court; DALLAS GROVER, judge. Opinion filed March 12, 1921. Affirmed.

*David Ritchie,* of Salina, and *D. B. Cogswell,* of Lincoln, for the appellant.

*Z. C. Millikin,* of Salina, and *John J. McCurdy,* of Lincoln, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action on a promissory note procured by fraud. After the discovery of the fraud, and before the note was negotiated by the swindler, the maker and the swindler made an agreement whereby the latter should retain the note and discount it upon condition that he would return it to the maker at its maturity without cost to him. The note was then discounted to the plaintiff, which knew of the fraud

and knew the terms of the agreement between the maker and the swindler. The note not being paid at maturity, the holder sued the maker. Plaintiff was defeated and appeals.

With the foregoing as a keynote to this lawsuit, it may be proper to narrate the facts in greater detail. In 1917, one Felix Broeker, who appears to have been a "frenzied financier" in Salina, sent out two agents, George Ripke and Carl W. Slater, to fleece some farmers of Lincoln county with worthless oil stock. They approached the defendant, C. H. Peckham, and his son-in-law, George Taylor, and Irwin Taylor, farmers of Lincoln county, and by false and fraudulent representations sold to them blocks of worthless stock in an oil company, taking their notes in payment therefor. The defendant gave his note for ten thousand dollars, which was turned over by Ripke and Slater to their principal, Felix Broeker. Peckham and the Taylor brothers then went to the oil fields in Oklahoma to ascertain what they had bought, and there learned that the oil company's assets were of little value and that they had been swindled out of their notes by false and fraudulent representations. They returned to Salina and demanded the surrender of their notes from Broeker and threatened suit for their recovery. Broeker pleaded for delay, because he had pledged the notes to a bank in Salina, but he promised to surrender the notes in thirty days. At the expiration of that time, Broeker being unable or unwilling to surrender the notes, a written contract was entered into between Broeker and these three farmers, and the Salina bank as follows:

"This agreement entered into in triplicate this 29th day of October, 1917, by and between Messrs. Irwin Taylor, C. H. Peckham and George Taylor, all of Vesper, Kansas, parties of the first part, Felix Broeker of Salina, Kansas, party of the second part, and The Traders State Bank of Salina, Kansas, party of the third part.

"WITNESSETH: Whereas Irwin Taylor and C. H. Peckham have each given their notes in the amount of $10,000.00 and the said George Taylor his note in the amount of $7,500.00 to party of the second part in payment of five thousand shares each of the capital stock of the Okla-Queen Oil Company.

"Now, therefore, in consideration of the agreement of parties of the first part to let their notes run until maturity and permit their discount, party of the second part hereby agrees and binds himself to return to parties of the first part their respective notes on or before their maturity,

Bank v. Peckham.

without cost to parties of the first part, and as security for the faithful performance of his agreement, party of the second part hereby agrees and does deposit in escrow with party of the third part fifteen thousand shares of the capital stock of the Okla-Queen Oil Company stock, this stock covered by the above mentioned notes, together with 2,500 shares of the capital stock of The Globe Life Insurance Company of Salina, Kansas, and party of the third part agrees to deliver to parties of the first part said collateral security consisting of both oil and Globe Life stock, in the event that party of the second part fails or refuses to carry out his agreement as above set forth. Parties of the first part, in the failure or refusal on the part of the party of the second part to carry out his agreement as above set forth, hereby agrees to offer for sale the collateral above mentioned to party of the second part before disposing of the same elsewhere."

At the time this contract was executed, Broeker also gave these three farmers a check for $3,500 which they cashed and divided, the defendant getting his share of it. Defendant Peckham testified that the proceeds of the check were to be returned to Broeker less whatever costs and expenses they might be-put to in procuring the return of their notes, and that they were holding the money on that condition.

The plaintiff is a banking corporation at Lincoln, Kan. These three farmers, Peckham and the two Taylors, had consulted with the plaintiff's cashier about their oil stock investment before going to Oklahoma to investigate, and after their return and after their first contract with Broeker to wait thirty days for the return of their notes, they consulted with Abe Marshall, the president of the plaintiff bank. Marshall knew of the fraud which had been perpetrated on them, and cautioned them to be on hand promptly to demand the return of their notes when the first thirty days had expired, admonishing them that Broeker was a "pretty slick kind of a fellow." When the second contract for the return of the notes was procured from Broeker, as set out above, it was intrusted to Marshall, president of the bank, for safe keeping. There is no serious dispute that the bank knew of the fraud and knew of the contract of October 29, which permitted the notes to be discounted and Broeker's obligation to recover and surrender them to the makers at or before maturity. Shortly afterwards, Broeker's agent, Slater, called on defendant Peckham, and Peckham accompanied Slater to the plaintiff bank and introduced him to Marshall, the bank president. There, in the

presence of Peckham, Slater sold the notes of Peckham and the Taylor brothers to Marshall's bank for $19,800. Marshall testified that before purchasing the notes he asked Peckham if it would be all right for the bank to buy the notes, and that Peckham answered that it would be all right as he and the Taylors were protected from loss if the notes were not taken up. Peckham denied this detail, but otherwise the main facts are not disputed. Broeker did not keep faith with the three farmers, and neither, apparently, did the Salina bank. The stocks which were supposed to be deposited in the Salina bank to secure Broeker's fulfillment of the contract were not so deposited. Neither did Broeker take up the notes and deliver them to Peckham and the Taylors according to the contract.

The material facts are settled by the two sets of findings returned by the jury in this action by the bank to recover on Peckham's note.

[Questions to jury submitted by plaintiff.]

"1. Was the defendant, C. H. Peckham, present at the time the plaintiff purchased the note in question? A. Yes.

"2. Did the defendant know that the plaintiff was purchasing the note in question? A. Yes.

"3. Did the defendant at the time the note in question was purchased make any objection or protest against the plaintiff purchasing the note? A. No.

"4. Did the president of the Saline Valley Bank, the plaintiff, know of the existence of the contract dated October 29th, 1917, before the plaintiff purchased the note in question? A. Yes.

"5. Did the plaintiff through any of its officers or agents know or have notice that the security required to be deposited under the contract dated October 29th, 1917, had not been fully made by Broeker at the time that the plaintiff purchased the note in question? A. No.

"6. Did the defendant consent to the sale of the note in question to the plaintiff at the time of the purchase by plaintiff? A. Yes."

[Questions to jury submitted by defendant.]

"1. Did George Ripke and Carl Slater obtain defendant Peckham's note by false and fraudulent representations? A. Yes.

"2. Was such note procured for the use and benefit of Felix Broeker? A. Yes.

"3. Did the plaintiff in this action before the note was purchased have notice that the note had been obtained from Peckham by fraud? A. Yes.

"4. Did the plaintiff before the purchase of the note have good reason to believe that the note had been obtained from Peckham by fraud? A. Yes.

"5. After visiting the leases in Oklahoma did the Taylors and Peckham demand the return of their notes given for the oil stock? A. Yes.

Bank v. Peckham.

"6. Soon after the Taylors and Peckham returned from Oklahoma, did Felix Broeker give them a contract to return their notes without payment in 30 days? A. Yes.

"7. If you answer the last question 'yes' did the plaintiff bank or its president or cashier have notice that such contract had been made soon after its date? A. Yes.

"8. Before the plaintiff purchased the note did it know that Felix Broeker on or about October 29, 1917, had entered into a contract in writing with Peckham, I. H. Taylor and George Taylor, agreeing to return to them their notes on or before maturity without cost to them? A. Yes.

"9. Did defendant Peckham at the time the bank purchased his note intend to surrender his right under the contract dated October 29th, 1917, for the return of his note without cost to him? A. No.

"10. When the bank purchased the note did Abe Marshall, its president, know that the note was not to be paid by the defendant Peckham? A. Yes."

The general verdict being for defendant, judgment was entered in his behalf.

The argument for the appellant bank centers around the proposition that the contract of October 29 and the payment of the $3,500 by Broeker waived the original fraud, and that the note in suit and the contract of October 29 are independent instruments, the obligation of each remaining intact and the remedy for the breach of each being separate and distinct.

It may be conceded at the outset that this is not a case where, on the pertinent facts being stated and the legal questions being indicated, the court can go forward with confident assurance that the pertinent law and resultant justice will be found to lie wholly on one side of the controversy. What was the purpose of the parties in making the contract of October 29? It was to prevent the immediate institution of lawsuits by Peckham and the Taylors against Broeker to prevent their notes being transferred to innocent purchasers and to recover them from Broeker. It also was designed to permit Broeker to use the notes temporarily as the basis of commercial credit. The legal effect of the contract was a temporary composition of the grievance of the makers against Broeker touching the fraud he had perpetrated on them. But it did not waive the fraud; it admitted it, and promised complete redress therefor—the surrender of the notes at a later time. If the contract had been carried out by Broeker, the fraud would have been waived; otherwise not. Of course, if Broeker had pushed to the fullest

extent the advantages which he had obtained from that agreement, by marketing the notes in the commercial world among innocent holders in due course, this particular lawsuit could not have arisen. Peckham would have to pay his note, and the Taylors theirs, and they would only have recourse against Broeker for breach of the contract, and against the Salina bank under its obligation as third party to hold the security stocks as a faithful depositary. The $3,500 furnished by Broeker was merely a fund for the use of Peckham and the Taylors should such litigation arise.

Now, what is the status of the present holder, the Saline Valley Bank of Lincoln? The bank knew of the fraud, and also knew of the contract and knew its terms. It was the custodian of that contract. The bank knew that Broeker had bound himself that the Peckham note should be returned to him without payment and without cost to Peckham. It knew that Peckham was not to pay the note. But the bank also knew that Peckham had consented that the note might be discounted, might be marketed, and indeed, Peckham knew and consented to the purchase of his note by the plaintiff bank. He stood by and saw Broeker's agent sell the note to the plaintiff, and made no objection. However, it will help to solve this problem if it be kept in mind that unless Peckham's note got into the hands of a holder in due course, it was not commercial paper at all, and it never did pass into such hands. Therefore the law of commercial paper has little to do with this question at issue. It was just a piece of paper reciting an apparent obligation between Peckham and Broeker, but which was in fact unenforceable between Broeker and Peckham, and it was supplemented by another piece of paper binding Broeker not to enforce but to surrender it. The stocks which Broeker pretended to pledge, and which the Salina bank pretended to hold, to secure the faithful performance of Broeker's contract to surrender Peckham's note, would not have to be considered if Broeker himself had attempted to enforce collection of Peckham's note. Broeker simply could not collect the note, because he would be met with his contract to surrender it without payment and without cost. (*Goodwin v. Nickerson*, 51 Cal. 166; *Martin v. Monroe*, 107 Ga. 330; *Straus v. Citizens' Bank*, 254 Ill. 185; *Higgins v. Ridgway*, 153 N. Y. 130; *Nat. Bank of Kennett Sq. v. Shaw*, 218 Pa. 612.)

Does not the plaintiff bank stand precisely on the same footing as Broeker? In selling the note to plaintiff could Broeker give the plaintiff some superior chose in action to that which he himself possessed? To an innocent purchaser—yes; but to plaintiff which knew all the facts—that is very doubtful.

Until the making of the contract of October 29, the note in Broeker's hands, or in the hands of anybody having notice of its infirmities, was a nullity. On that day it was given a certain limited vitality by the contract, but the note and contract should be construed as of contemporaneous dates and as if they together constituted one entire contract. They should be construed together even in the hands of plaintiff, since plaintiff acquired the one instrument with notice of its infirmities and held the other as its custodian and with notice of its contents. (*Salt Co. v. Barber,* 58 Kan. 419, 422, 49 Pac. 524.)

Now, just what was that limited vitality which the contract of October 29 gave to Peckham's note? It was agreed that the note might be discounted so that Broeker might use it for a limited time as the basis of credit, or that he might sell or otherwise dispose of it provided that by the time of its maturity he would do whatever was necessary to repossess himself of it—that he would redeem it—so as to be able to surrender it to Peckham without cost to him. That seems to be the fair and proper interpretation of the note and contract construed together. If that is correct, it seems obvious that the plaintiff bank, standing as it does in no stronger position than Broeker, cannot withdraw the note from its associated contract and collect on it from Peckham in disregard of the contract, any more than Broeker himself could do.

In *The Marietta Savings Bank v. Janes,* 66 Ga. 288, the defendant, Janes, at the written request of one Waddell, and with Waddell's written assurance that "it shall never in any way or manner prejudice you [the maker] individually," gave Waddell his promissory note which Waddell transferred to the plaintiff bank after its maturity. It was held that Jane's note and Waddell's letter constituted one contract, that it was in effect an agreement not to sue and to release the maker as against the payee Waddell; and as the bank received the note after its maturity it was subject to all the defenses which would be good against Waddell.

From the above case it may be logically deduced that one who purchases a note before its maturity with notice of an agreement that the maker was not to pay it is in no better position than a purchaser after its maturity who may have no such actual notice but who is charged in law therewith.

In one of the "Bohemian Oats" cases of thirty years ago (*Sutton v. Beckwith,* 68 Mich. 303), a Michigan farmer, Charles S. Beckwith, gave his note for $400 to some swindlers, for 40 bushels of Bohemian seed oats. The swindlers gave Beckwith a separate written contract that the note would not have to be paid until they had sold 80 bushels of Beckwith's ensuing crop of oats for $800. The swindlers transferred the note before maturity to plaintiff, who had notice of the facts. In the opinion the court said:

"It is evident that the consideration of the note in suit was not the 40 bushels of oats, at $10 per bushel, but the agreement or bond executed and delivered at the same time as the note. . . . He was to receive $800 for 80 bushels of oats before he was to pay $400 for the 40 bushels delivered to him. This agreement was what he acted and relied upon, and formed the consideration of his note. He would never have given it for the 40 bushels of oats independent of the promise in the bond. The oats he received cut but little figure in the dealing in the mind of the defendant.

"Nor was this agreement or bond a collateral undertaking. It was executed at the same time as the note, and a part of the same transaction.

"These two papers, so executed, must be taken and construed together. They formed one contract, and between the original parties to the note, could not be enforced until the agreement was performed. It has been well settled, in this state and elsewhere, that several instruments made at one and the same time, and having relation to the same subject matter, must be taken to be parts of one transaction, and construed together for the purpose of showing the true contract between the parties. *Singer Mfg. Co. v. Haynes,* 36 Mich. 385; *Smith v. Van Blarcom,* 34 Id. 371 (8 N. W. Rep. 90); *Dudgeon v. Haggart,* 17 Id. 273; *Eberts v. Selover,* 44 Id. 519 (7 N. W. Rep. 225); *Chapman v. Colby,* 47 Id. 46, 51 (10 N. W. Rep. 74); *Bronson v. Green,* Walk. Ch. 56; *Makepeace v. College,* 10 Pick. 298, 302; *Jackson v. McKenney,* 3 Wend. 233. . . .

"If the plaintiff had been a good-faith holder of the note, with no knowledge of the bond, he would have been entitled to recover, because of the negotiable form of the note.

"But if he purchased the note before due, and before the time of performance stated in the bond, with the agreement attached to it and forming a part of the contract, he would be obliged, under the law, to take the note as qualified and controlled by the bond or agreement. And if he saw the bond before he purchased the note, and was acquainted with its

relation to the note, he must be considered as bound by it, the same as if it had been attached to the note, or written upon the same piece of paper. The bond not having been performed, the consideration failed, and the plaintiff could not recover, unless the jury believed his claim that the defendant came to him, or saw him, and told him the note was all right, and he would pay it when it became due." (pp. 309-311.)

It may properly be remarked here that the swindling of farmers with fraudulent contracts for seed oats, patent rights, lightning rods, etc., which was so prevalent a generation ago, was no more reprehensible than the flagrant and highhanded swindles perpetrated nowadays with stocks in oil wells not yet spouting but just getting ready to spout, and oil leases not yet drilled but with drilling rigs near at hand, and similar fraudulent frame-ups garbed in fancy and falsehood. And those who buy the notes which credulous people have given for worthless oil stocks, with full knowledge of the frauds by which the purveyors of these notes acquired them, are entitled to no more consideration than the buyers of notes given for Bohemian oats, with notice, were given by respected American jurists of thirty years ago. (See note, 46 L. R. A., n. s., 873, *et seq.*)

In *Simpson v. Van Laningham*, 267 Mo. 286, one Simpson gave two notes to a refrigerator company for $5,000 for 100 shares of its capital stock. The refrigerator company at the same time gave Simpson an obligation in writing as follows:

"You have this day purchased of the Merchants' Refrigerator Company 100 shares of the capital stock . . . for which you have given two notes of $5,000 each in settlement due in six months.

"This statement is for the purpose of guaranteeing to you that at the maturity of said notes you may, at your option, surrender the stock and if you do surrender said stock, we jointly and severally agree to cancel and return to you your two notes of $5,000 each upon the delivery to us of said stock." (pp. 292, 293.)

The refrigerator company sold the notes to the National Bank of Commerce of Kansas City before maturity. The bank had full notice of the agreement for the surrender of the notes upon return of the refrigerator stock. The bank went into the hands of a receiver who sold the notes after maturity to Doctor Woods and another, and they authorized plaintiff to bring suit. In that case, as in the one before us, it was urged that the agreement constituted no defense, and that it was collateral and independent of it, and that the agreement was a mere

guaranty and intended merely to afford an action in case of noncompliance with its terms. These contentions were rejected, but space will not permit us to do more than quote two sections of the syllabus, which read:

"Notes made payable to the maker and indorsed in blank by him become payable to bearer and negotiable by delivery; and a transferee before maturity with actual knowledge of a concurrent dependent agreement, and a transferee after maturity without actual knowledge, take the notes with notice of the agreement and that it makes them nonpayable.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"The maker of negotiable notes received a concurrent written agreement, signed by a corporation and its president, reciting that the maker had purchased one hundred shares of the capital stock of the company, for which he had given his two notes in settlement, due in six months, and guaranteeing that the maker, at their maturity might, at his option, surrender the stock, whereupon the notes would be canceled and returned to him. The certificates of stock, indorsed in blank, were attached to the notes, and the notes were transferred to a bank, whose cashier had full actual knowledge of the agreement. Shortly afterwards the bank went into the hands of a receiver, who, after the maturity of the notes, sold them to plaintiff. *Held*, that the notes and agreement did not constitute independent contracts, but they are dependent, and the agreement constitutes a defense to an action on the notes; and since the payee of the notes, when the agreement was delivered, was the holder, and the holder signed the agreement, the rule is not changed by the fact that another also signed it." (Syl. ¶¶ 1, 3.)

The case of *Todd v. State Bank*, 182 Iowa, 276, is much the same in principle. One Todd had contracted to purchase certain Texas lands from a realty company. He paid down some cash and gave promissory notes for the balance. The realty company gave Todd a contract in which it was provided:

"All money paid under this contract to be returned if warranty deed and abstract are not furnished as herein provided." (p. 279.)

Later the realty company sold and indorsed Todd's notes to the defendant bank, which was fully informed of the terms of the contract, and the contract itself was in the defendant bank's custody. In the opinion the court said:

"As between the parties to the contract, it is perfectly clear that both the contracts made, each in connection with or in consideration of the other, are to be read together, in determining the mutual rights of such parties, and neither can recover against the other without performance or tender of performance on his own part of their mutual covenants. It is not to be denied that, if a note so made is negotiable in form, and is, in

Bank v. Peckham.

fact, negotiated before due and for value, to an indorsee who receives it without notice of the conditional character of the promise to pay, he will be protected as an innocent purchaser, and may enforce collection of the note, notwithstanding the failure of the payee to perform his agreement by the conveyance of the title. But it is very difficult to understand upon which theory the defendant in this case can bring itself within the benefit of that rule. As the purchaser of the note, and the assignee of the contemporaneous contract, it had perfect and complete knowledge of the contract between the parties; and, as a matter of law, it must be held to have known and understood the mutual dependency of the maker's agreement to pay, the payee's agreement to convey, and that, as between these parties, the payee could not enforce payment without proof of its performance, or of its readiness and willingness to perform. If the payee could not collect the note without such showing, by what rule, or upon what principle, can the indorsee, taking the paper with knowledge of the rights and equities of the maker as against the indorser, hope to stand in any better right? Had the contract and the accompanying note been written together—both upon the same sheet of paper—and in that form indorsed and delivered to the bank, counsel would hardly argue that by suing upon the note alone, it could exclude the defense thereto which is asserted in this case and founded upon the entire agreement. See *Goodwin v. Nickerson*, 51 Cal. 166. But so long as it is conceded, as it must be, that the note was but a part of the contract, and that defendant knew the fact, it is perfectly immaterial whether it was written all upon the same sheet or whether the mutual and dependent covenants were written on separate sheets. It is scarcely necessary to cite authorities to this proposition, which is entirely clear upon principle; but it may be said that the proposition is directly affirmed in *Thomas's Assignee v. Page*, 3 McLean (U. S.) 167, where it was held that a note, though absolute in form, may, by a separate agreement between the parties, be made payable on condition; and, in the hands of an assignee or indorsee with knowledge of the condition, it takes effect the same as between the original parties. See, also, *Sutton v. Beckwith*, 68 Mich. 303 (36 N. W. 79). We conclude, therefore, that defendant was a holder of the note and of the contemporaneous contract between the original parties, charged with notice of the equities in favor of plaintiff." (p. 288.)    (See, also, *Lutton v. Baker,* [Ia.] 174 N. W. 599.)

In our investigation of the decisions in analogous cases, candor constrains us to admit that there are many which attach controlling significance to the regard which must be given to the rules of commercial paper and to the necessity that those rules must not be unsettled merely to relieve a few unwary persons who have been overreached by swindlers. With that general principle this court is and always has been in full accord. But we have reached the conclusion that the law of com-

mercial paper does not control this case. It is chiefly controlled by the law of contracts—the contract of Broeker and defendant; and plaintiff merely stands in Broeker's shoes.

The trial court committed no error, and the judgment is affirmed.